*In re* EDELMIRO MARTÍNEZ RIVERA, querellado.

*Número:* O-74-197          *Resuelto:* 29 de septiembre de 1977

*Miriam Naveira de Rodón, Procuradora General, Candita R. Orlandi, Roberto Armstrong, Jr., y Justo Gorbea Varona, Procuradores Generales Auxiliares,* abogados de El Pueblo; *Edelmiro Martínez Rivera,* por derecho propio y *Fausto Ramos Quirós,* abogado del querellado.

PER CURIAM: La Procuradora General formuló querella contra el abogado Edelmiro Martínez Rivera en que le imputó conducta inmoral e impropia en dos cargos que pueden sintetizarse así: (1) alegado conflicto de intereses al actuar como abogado del ingeniero Víctor E. Silva en un litigio sobre ejecución de hipoteca seguido contra éste por el Banco Crédito y Ahorro Ponceño, siendo al mismo tiempo el querellado presidente y dueño de la casi totalidad de las acciones de la Compañía de Fianzas de Puerto Rico, corporación que

garantizaba a Silva y que a su vez era acreedora hipotecaria con interés en los bienes objeto del mencionado litigio; y (2) haber utilizado lenguaje irrespetuoso en un titulado "Escrito de Repudio" dirigido al juez que intervino y dictó resolución en un incidente dentro del referido pleito sobre ejecución de hipoteca.

El querellado contestó oportunamente los cargos. Admitió algunas alegaciones, entre ellas su intervención como abogado de Silva en el proceso ejecutivo hipotecario seguido por el Banco, dueño desde el 1961 y hasta octubre de 1973 de la casi totalidad de las acciones pagadas de la Compañía de Fianzas de Puerto Rico y presidente de su Junta de Directores, y que dicha Compañía actuaba como garantizadora de contratistas de obras, y en particular del ingeniero Silva. Negó que hubiera conflicto de intereses. En cuanto al segundo cargo, aceptó haber presentado el alegado "Escrito de Repudio," negó que lo allí expresado constituya conducta inmoral e impropia, y alegó que suscribió y presentó dicho escrito en legítima defensa de su honra y reputación personal y profesional. Adujo, además, que transcurrieron cinco años entre la presentación del escrito y de la querella, por lo que cualquier sanción disciplinaria constituiría un castigo cruel e inusitado; y que el asunto ya estuvo ante este Tribunal Supremo, se ordenó su archivo, y no procedería exponerlo por segunda vez en riesgo de ser sancionado por la misma falta.

Trabada así una controversia, referimos el asunto a un Comisionado Especial, con la encomienda de oír y recibir las pruebas, hacer constar las objeciones, certificarlas, y en su oportunidad formular conclusiones de hechos. La designación recayó finalmente en la persona del ex juez del Tribunal Superior, Lcdo. Miguel A. Velázquez Rivera.

Con fecha de 20 de septiembre de 1976 el Comisionado Especial rindió un extenso informe con sus correspondientes conclusiones de hechos. El querellado objetó algunas de sus determinaciones. No hallamos que dichas objeciones sean

atendibles. Van dirigidas esencialmente a aspectos sobre credibilidad. Estudiadas cuidadosamente las conclusiones de hechos del Comisionado, reflejan un juicioso y ponderado análisis de todas las pruebas y merecen nuestro respeto. Las exponemos a continuación:

"Determinaciones de Hecho

1. El querellado Edelmiro Martínez Rivera comenzó a tener relación con el quehacer judicial en el año 1922. En esa fecha fue designado taquígrafo del Tribunal Supremo de Puerto Rico. Como resultado de esa experiencia en el tribunal se interesó en el estudio del derecho habiendo sido admitido al ejercicio de la profesión de abogado, luego de cursar los estudios correspondientes, en el mes de abril de 1928.

2. El querellado ha estado dedicado a la práctica activa de la profesión de abogado a partir del año en que fue admitido. No obstante, aun desde antes del año 1928 tenía negocios particulares. Su actividad en el campo de los negocios ha continuado durante todo el tiempo en que ha estado practicando la profesión.

3. Entre los cargos que el querellado ha ocupado, relacionados con su profesión, se cuentan el de Presidente de la Delegación de San Juan del Colegio de Abogados, Juez Temporero del antiguo Tribunal de Distrito, Miembro de la Comisión de Reputación de los Aspirantes a la Abogacía, Delegado a la Conferencia Internacional de Abogados en el 1939 y Miembro de la Junta de Gobierno del Colegio de Abogados durante 5 años. Está autorizado a practicar la profesión ante el Tribunal Supremo de Puerto Rico y el Tribunal Supremo de Estados Unidos.

4. En el año 1961 el querellado, en unión a su esposa y otros miembros de su familia, organizó la Compañía de Fianzas de Puerto Rico, entidad que actúa como aseguradora de garantía en el país bajo las disposiciones del vigente Código de Seguros de Puerto Rico. El certificado de autorización para hacer negocios fue expedido a la compañía el 1ro. de agosto de 1961. Desde el momento en que inició sus actividades la compañía designó al querellado como su Presidente. Como cuestión de hecho éste era el dueño y tenía el efectivo control de la mayoría de las acciones de la compañía hasta reciente fecha.

5. El señor Víctor E. Silva es un ingeniero civil, graduado como tal en 1952. En la actualidad reside en la ciudad de Ponce.

Allá para el año 1963 Silva había organizado, en unión a familiares y allegados, una corporación denominada Howard Construction Corporation, razón social bajo la cual él realizaba negocios de construcción de obras, incluyendo carreteras y edificios. Otros integrantes de la Junta de Directores de la indicada corporación lo eran la esposa de Silva y un maestro de obras, nombrado Guillermo Díaz.

6. Allá para el año 1963 Silva visitó las oficinas de la Compañía de Fianzas de Puerto Rico en la ciudad de San Juan, iniciándose en esta forma una relación de negocios que se extendería durante varios años. Como resultado de esa visita Silva y la Compañía llegaron a un acuerdo a virtud del cual la Compañía prestaría fianzas de cumplimiento y pago en relación con las obras de construcción de la empresa de Silva. La prueba aportada durante la audiencia demostró que desde el 7 de junio de 1963 al 1ro. de noviembre de 1971 la Compañía de Fianzas de Puerto Rico prestó fianzas por Howard Construction Corp. y/o Víctor Silva, garantizando obras a ser realizadas por éstos, por la suma de $1,667,534.16. Por concepto de primas a recibir durante dicho período la Compañía facturó por la suma de $17,360.33.

7. El Ing. Silva declaró durante la audiencia que la razón por la cual decidió iniciar negocios con la Compañía de Fianzas de Puerto Rico fue la de que ésta no le exigía la presentación de estados financieros y que era más liberal que las demás. Lo cierto es que la norma que la Compañía tuvo desde su origen consistía en no otorgar fianzas de cumplimiento y pago a ningún contratista que las solicitara sin exigir, tanto una garantía colateral como prueba de solvencia moral y económica del interesado. Por tanto, en la etapa inicial, la Compañía accedió a prestar fianzas por Silva y su empresa constructora a base de un convenio de garantía a virtud del cual Silva cedía a la Compañía de Fianzas de P. R. diversos créditos que él alegaba tener contra los Municipios de Coamo, Santa Isabel, Arroyo y Salinas. Eventualmente se diseñó, por mutuo acuerdo, un sistema a virtud del cual Silva cedía como garantía colateral, a la Compañía de Fianzas, el 10% del total del costo del proyecto.

8. Los negocios continuaron normalmente entre ambas partes durante varios años. El total de la suma que la Compañía garantizaba fue aumentando con el paso del tiempo. En una ocasión la Compañía garantizó hasta un máximo de $475,000.00 por la eje-

cución de obras de Silva. La compañía, por su parte, exigía continuamente colaterales adicionales, las cuales llegaron a incluir hipotecas sobre equipos mecánicos que Silva alegaba poseer.

9. Mientras tanto desde el año 1965, la empresa Constructora propiedad de Silva había estado utilizando al Banco Crédito y Ahorro Ponceño como fuente de financiamiento. Esta entidad bancaria le había extendido una línea de crédito hasta la suma de $125,000. Como garantía colateral Silva había suscrito sendos pagarés al portador, garantizados con hipoteca, sobre dos inmuebles que el contratista poseía en la zona de Guayama, uno de los cuales figuraba inscrito en el Registro de la Propiedad a nombre de una hermana suya, nombrada Libertad Silva. El Banco era tenedor de los referidos pagarés y la hipoteca, con rango de primera, constaba debidamente inscrita en el Registro.

10. Las obligaciones financieras de Silva aumentaron a un ritmo tal que se vio imposibilitado de cumplirlas a su vencimiento. En consecuencia, el 10 de agosto de 1967 el Banco Crédito y Ahorro radicó ante la Sala de Ponce del Tribunal Superior, el caso civil *Núm. 67/2923*, sobre Ejecución de Hipoteca, demandando de Silva y sus asociados el pago de la suma aproximada de $59,000, a la cual había quedado reducida la deuda original proveniente de la línea de crédito que le había sido extendida. A pesar de que Silva compareció en autos representado por abogado no pudo desvirtuar las alegaciones contenidas en la demanda por lo que el Tribunal, el 6 de febrero de 1968 dictó sentencia declarando con lugar la demanda. A solicitud de los demandantes la corte señaló fecha para la venta en pública subasta de las propiedades hipotecadas.

11. En el ínterin, Silva hacía continuas gestiones para poder obtener nuevas fuentes de financiamiento para afrontar el cúmulo de obligaciones económicas que surgían. Por un lado trató de conseguir un préstamo a fin de solicitar del acreedor hipotecario que le permitiera solventar la deuda a pesar de haber recaído sentencia. Por otro lado trataba de obtener la buena pro en subastas de obras gubernamentales con miras a obtener ganancias con los [sic] cuales enjugar las cuantiosas deudas que tenía.

12. Así las cosas, en el mes de julio de 1968 Silva visitó las Oficinas de la Compañía de Fianzas en San Juan y se entrevistó con el Presidente de ésta, el querellado en el caso del epígrafe.

Convinieron que la Compañía le extendería una fianza de cumplimiento y pago para garantizar las obras de construcción de un proyecto sobre el cual Silva había obtenido la buena pro en el Municipio de Santa Isabel. Como el importe de las sumas que la Compañía estaría garantizando en los varios proyectos que Silva estaba llevando a cabo sería considerable el querellado le requirió para que ofreciera a la Compañía garantías colaterales adecuadas a las circunstancias del caso. Silva estuvo de acuerdo y ofreció al querellado garantías consistentes en un gravamen adicional sobre los dos inmuebles que poseía en Guayama, los cuales ya estaban sujetos a una primera hipoteca con el Banco Crédito.

13. Precisa señalar—a modo de digresión del Comisionado suscribiente—que la evidencia que desfiló durante la audiencia en el caso del epígrafe revela que existe una insalvable diferencia entre los testigos sobre lo que realmente aconteció durante esta entrevista. La versión del Ingeniero Silva iba dirigida a demostrar que el querellado—al requerirle las garantías inmobiliarias adicionales a favor de la Compañía de Fianzas—había expresado que la hipoteca que se otorgara no se inscribiría en el Registro de la Propiedad correspondiente, sino que se retendría en las Oficinas de la Compañía para cumplir con requisitos reglamentarios exigidos por la Oficina del Comisionado de Seguros. El querellado por su parte, afirmó que nunca hizo promesa en tal sentido al Ingeniero Silva y que su único convenio a este respecto fue el de que la hipoteca a otorgarse tendría el rango de segunda hipoteca en el Registro porque todos estaban conscientes, y de los documentos así surgía, que los inmuebles estaban gravados por una primera hipoteca a favor del Banco Crédito y Ahorro Ponceño.

El Comisionado suscribiente ha concluido que los hechos acontecieron como los relató el Ingeniero Silva en la silla testifical. Los factores que han sido tomados en cuenta para esta determinación son las [*sic*] siguientes:

(a) El Ingeniero Silva, cuando surgen los problemas que más adelante se relatarán, espontáneamente ofrece la explicación sobre la promesa del querellado, (b) es el propio Silva el que sugiere que llamen al querellado para que corrobore su versión; (c) el querellado consideró la posibilidad de retirar la escritura en controversia cuando por primera vez se le confronta con el problema que se ha creado y (d) el Ingeniero

Silva recurre al propio querellado para que le ayude a salir del problema que la presentación de escrituras contradictorias en el Registro ha de causar.

Al dirimir esta controversia el Comisionado suscribiente tuvo, además, el beneficio de la lectura de la Declaración Jurada prestada por el letrado Ernesto Agostini Pascual y de la transcripción taquigráfica de una vista relacionada con estos hechos que se celebró el 18 de octubre de 1968 ante el Tribunal Superior de Ponce, en el caso Civil 67-2923. Así mismo ponderó la explicación que—al declarar en su propia defensa—expuso el querellado en este caso. A nuestro juicio resulta claro que el querellado prometió al Ingeniero Silva que la escritura de hipoteca a otorgarse no sería presentada al Registro de la Propiedad correspondiente, por lo menos, por el momento.

14. En efecto, el 29 de julio de 1968 el Ingeniero Silva y su esposa comparecieron ante el Notario de San Juan, Miguel A. Rosa y otorgaron dos pagarés por la suma total de $150,000, garantizándolos con hipoteca sobre las fincas de su propiedad en Guayama. En la escritura de hipoteca que se otorgó ese día se hizo constar que los inmuebles estaban sujetos a un previo gravamen hipotecario a favor del Banco Crédito y Ahorro. Los pagarés fueron entregados por Silva a la Compañía de Fianzas en calidad de la garantía colateral acordada. La copia de la escritura correspondiente fue remitida al Registro de la Propiedad en Guayama. El Comisionado suscribiente está convencido de que el querellado no tuvo intervención personal alguna en el envío de la escritura al Registro de la Propiedad. Como cuestión de hecho, desde fines de julio de 1968 el querellado se ausentó de Puerto Rico, en unión a su familia y no es hasta su regreso que se entera de los problemas que la presentación de la escritura ha ocasionado a las personas interesadas.

15. Coetáneamente con estos arreglos, Silva continuaba sus incesantes gestiones para tratar de aminorar el impacto de sus múltiples compromisos financieros. A principios del mes de julio de 1968 Silva se enteró que el Banco tenía un interés mayor en recibir el importe del capital e intereses adeudados que en retener para sí los inmuebles a punto de ejecutarse. También se enteró que el Lcdo. José Colón Gordiany, entonces Fiscal de Distrito de Guayama, era una posible fuente de financiamiento. Aun cuando no lo conocía, Silva requirió de este letrado que le prestara $50,000.00. El Fiscal rechazó el pedido en más de una

ocasión pero, finalmente, accedió a retirar unos ahorros que tenía en un banco y prestar a Silva la suma requerida por éste, a condición de que se le garantizara el pago de la suma prestada con una primera hipoteca sobre bienes inmuebles. Silva gestionó con oficiales del Banco Crédito una solución favorable. Finalmente se llegó a un acuerdo. El convenio consistía en que Colón Gordiany prestara a Silva $50,000. Este endosaría la totalidad de dicha suma al Banco para abonar a los $59,000 que aproximadamente le debía. El Banco accedería a que Colón Gordiany obtuviera una primera hipoteca sobre los inmuebles en garantía del préstamo. Por último el Banco obtendría una segunda hipoteca, sobre la misma finca, en garantía de la suma que dejaba Silva sin saldar y de honorarios de abogado y gastos convenidos. Al sellarse el acuerdo Silva nada dijo a Colón Gordiany ni a los oficiales ni abogados del Banco sobre la escritura de hipoteca que él había suscrito el 29 de julio de 1968 en San Juan. Precisamente ese mismo día los abogados del Banco comparecieron por escrito al Tribunal Superior de Ponce y solicitaron de éste que suspendiera la venta en pública subasta porque la parte estaba en comunicaciones tendentes a satisfacer la sentencia.

15-A. El 30 de agosto de 1968 Silva, Colón Gordiany y los oficiales del Banco Crédito se reunieron en Guayama en las Oficinas del Notario ante el cual se otorgaron las escrituras contentivas de la transacción acordada. Por razón de ciertas restricciones que a favor del Banco existían en la escritura de primera hipoteca ya inscrita, el Notario no creyó prudente sustituir a Colón Gordiany por el Banco como primer acreedor hipotecario sino otorgar escrituras de cancelación de la hipoteca inscrita y constituir entonces una nueva primera hipoteca a favor de Colón Gordiany por $50,000, y una segunda hipoteca a favor del Banco, por la suma restante. Así se hizo. Como cuestión de hecho, en el acto de la firma Colón Gordiany entregó $50,000 a Silva, éste la pagó al Banco y todos suscribieron los documentos legales descritos, retirándose poco después del lugar.

16. Cuando las escrituras otorgadas el 30 de agosto de 1968 fueron presentadas al Registro por los empleados del Notario comenzó a gestarse la serie de acontecimientos que culminaron en este procedimiento de investigación de conducta profesional. El Registrador notificó a los interesados que, de accederse a las cancelaciones solicitadas se vería obligado a reconocer rango de primera hipoteca sobre los inmuebles de Silva a la otorgada el

29 de julio de 1968 en San Juan, la cual estaba presentada en el Registro desde el 5 de agosto de 1968. Al tener conocimiento de este giro en los acontecimientos el Notario, que a la vez era el abogado del Banco en los procedimientos seguidos en el caso civil CS-67-2923 sobre Ejecución de Hipoteca contra Silva, se dirigió a la residencia de éste a exigir explicaciones y, al propio tiempo, acariciando en su mente la idea de que pudiera haber sido víctima de un engaño por parte del citado contratista. Silva le explicó que el asunto, a su juicio, tenía solución porque él confiaba en que el Presidente de la Compañía de Fianzas—el querellado Edelmiro Martínez Rivera—estaría dispuesto a retirar la Escritura de Hipoteca del Registro, facilitando en esta forma, la transacción que se acababa de realizar con el Banco. Es en este momento que por vez primera Silva le informa de la promesa que le había hecho el querellado de no presentar la hipoteca al Registro.

17. Preocupado con toda la situación el Notario llamó por teléfono al querellado. Le informó lo que había ocurrido y le preguntó si la Compañía estaría dispuesta a retirar la escritura del Registro. El querellado le contestó que él tenía que pensarlo y que tomaría una decisión final en unos días. Al ser llamado nuevamente a la siguiente semana el querellado expresó una posición definitiva. No estaba dispuesto a retirar la Escritura del Registro ni a renunciar al rango registral a que tenía derecho a no ser que Silva sustituyera esa garantía por otra adecuada ya que, por razón del incumplimiento de la empresa propiedad de Silva, la Compañía había tenido que hacer frente a continuas y ascendentes reclamaciones de pago de diversos suplidores.

18. Los abogados del Banco—enterados de la posición de la Compañía de Fianzas—exigieron responsabilidad a Silva. Este prestó y entregó a ellos una declaración bajo juramento en la cual afirmaba que, en la ocasión en que él convino otorgar una hipoteca sobre sus bienes y entregarla a la Compañía de Fianzas como garantía colateral, el querellado le había prometido no presentar la referida escritura de hipoteca al Registro de la Propiedad correspondiente. El 8 de octubre de 1968, radicaron una moción, dentro del caso civil *CS-67-2923* en el cual el Banco había obtenido sentencia, ordenando la ejecución de las propiedades de Silva, relatando los hechos que habían ocurrido con posterioridad a la sentencia; describiendo la naturaleza de la transacción que había realizado con el demandado; informando

248

del otorgamiento de las escrituras para instrumentar el acuerdo y señalando la naturaleza de las actuaciones del demandado Silva al no informarles que había otorgado una escritura anterior conteniendo un gravamen sobre los inmuebles. Suplicaban que se anulara la transacción, se declararan nulos los documentos otorgados en cumplimiento de la misma y que se restituyera la situación procesal a su estado anterior a fin de proceder a la ejecución de la sentencia y vender en pública subasta los inmuebles propiedad de Silva.

19. El Tribunal señaló la moción para el día 18 de octubre de 1968. Ordenó que se citara a las partes en el pleito. El demandado Silva fue notificado a través de su abogado de récord el Lic. Helio Zeno. Al enterarse de la situación Silva visitó al querellado en San Juan. Le informó que lo habían citado para una vista y le relató lo acontecido. El querellado le expresó su opinión en el sentido de que nada tenía que temer el Banco pues Silva había pagado gran parte de la deuda y el Banco mantenía una primera hipoteca sobre los inmuebles. Le informó, además, que él se trasladaría a Ponce en la fecha señalada y lo representaría legalmente ante el Tribunal.

20. El 18 de octubre de 1968 fue llamado el caso para la vista de la moción. Presidía la Sala el Hon. Juez Antonio Matta. El demandado Silva se había quedado fuera del Tribunal. El Magistrado insistió en que, debido a la naturaleza de las alegaciones que se hacían en la moción, él no entraría a la vista del incidente sin la presencia del demandado. Poco después éste entró a la Sala. El Juez le requirió para que expresara para el récord quién era su abogado ya que el Lic. Zeno había intentado renunciar. Silva expresó que el Lic. Martínez Rivera lo representaría. Así, en efecto, sucedió.

21. Es preciso hacer notar que en esta primera etapa de representación profesional el querellado insistió en que él representaba a Silva a los solos fines del incidente que se iba a ventilar. En el ánimo del Comisionado suscribiente no existe la mínima duda de que ese era el propósito original del querellado. Pero, como expondremos a continuación, las circunstancias que a partir de este momento coinciden, provocan una rápida e inusitada sucesión de acontecimientos que desembocan en el actual proceso.

Pues bien, la audiencia sobre el incidente se limitó a la prueba que presentaron los abogados del Banco que consistió en

la declaración jurada que había prestado Silva en la cual éste describía la promesa que, según él le había hecho el querellado y en el testimonio de los letrados Colón Gordiany y Agostini Pascual. Este último había sido el Notario ante quien se habían otorgado los documentos instrumentando la transacción.

Nos llama poderosamente la atención—como también ocurrió al Juez que entendió en el incidente—que el aquí querellado, no contradijo durante la vista de la moción el testimonio del Notario al efecto de que él había llamado al querellado a San Juan y éste le había informado que efectivamente había prometido a Silva no presentar la escritura al Registro, pero que luego se había arrepentido. Sobre los méritos de la moción el querellado se limitó a plantear, a nombre de su cliente Silva, la falta de jurisdicción del Tribunal para entender en una moción de la naturaleza de la que se había planteado dentro del caso, cuando ya la sentencia de ejecución de hipoteca era final y firme.

22. A los pocos días de celebrada la vista de la moción ante el Tribunal Superior de Ponce, el querellado se ausentó de Puerto Rico. Cuando regresó, se topó con la Resolución que, con fecha de 18 de diciembre de 1968 había dictado el magistrado que había presidido la vista de la moción y en la cual resolvía los méritos de la misma.

En la referida Resolución el Tribunal, no sólo accedía a lo solicitado por el Banco al efecto de anular toda la transacción realizada entre Silva, Colón Gordiany y el Banco Crédito y declarar inexistente todas las escrituras contentivas del acuerdo, sino que específicamente declaraba que el querellado Edelmiro Martínez Rivera había incurrido en conducta dolosa, de naturaleza grave y que ese era el motivo principal por el cual debía anularse la transacción.

A juicio del suscribiente, nada hay en la evidencia que tuvo ante su consideración el magistrado que justificara la conclusión de que el querellado había incurrido en dolo grave en relación con la transacción que realizaron Silva y el Banco. Aun en la eventualidad de que el querellado le hubiese hecho la promesa a Silva de no presentar la escritura de hipoteca en el Registro, no hay prueba alguna de que ese hecho tuviese relación con plan o maquinación alguna del querellado para engañar al Notario o a los funcionarios del Banco. Como cuestión de hecho no hay posibilidad alguna de cometer dolo de la naturaleza del imputado por el magistrado, para sorprender la buena fe de un Notario,

bajo el sistema registral existente en Puerto Rico en el cual el Notario no otorga las escrituras hasta que se cerciora de las constancias del Registro de la Propiedad.

23. Tan pronto como se enteró de la Resolución del Tribunal, el querellado comenzó a reaccionar tanto como abogado como persona afectada por el dictamen. Radicó el 17 de enero de 1969 a nombre de su cliente, Silva y sus asociados un escrito solicitando la nulidad de la Resolución. Fue declarado sin lugar por el Tribunal. De nuevo el 22 de enero de 1969 el querellado solicitó que se dejara sin efecto la Resolución y por segunda vez su solicitud corrió igual suerte.

24. El querellado radicó entonces, el 28 de enero de 1969 y forma parte del expediente del caso, un documento titulado 'Escrito de Repudio' que literalmente lee:

'El suscrito Edelmiro Martínez Rivera toma excepción de los conceptos contra su persona en la "Resolución" del señor Juez Antonio J. Matta de diciembre 18 de 1968 y los repudia y rechaza fuerte y enfáticamente. Las expresiones difamantes incluidas en la Resolución de marras son un ataque libeloso, injustificado, innoble y gratuito al suscrito de parte del Juez que la emitió. Además de no tener respaldo alguno en el récord, carecen del más elemental sentido de respeto y de observancia de las disposiciones en la Constitución de Puerto Rico que garantizan al suscrito protección de ley contra ataques abusivos a su honra y a su reputación (Art. 2(8)) así como contra enjuiciamiento sin ser notificado de cargos y sin que se le dé oportunidad de contestarlos y de ser oído en juicio.

Y lo curioso es que el Juez actuante se desempeñó como hemos indicado a pesar de tener vigente el compromiso que contrajo bajo juramento al asumir las funciones del cargo que ocupa de guardar fidelidad a la Constitución y a las Leyes del Estado Libre Asociado de Puerto Rico.'

25. El Tribunal Superior de Ponce, al recibir el escrito a que se ha hecho referencia ordenó que copia de dicho documento y la transcripción taquigráfica de lo ocurrido durante la vista celebrada el 18 de octubre de 1968 fueran remitidas al Tribunal Supremo de Puerto Rico para la acción pertinente. El Tribunal Supremo, el 7 de marzo de 1969, emitió una breve Resolución disponiendo que nada había que proveer y ordenando que se devolvieran los autos del caso al Tribunal de origen.

26. Luego de esos incidentes el querellado se ausentó nueva-mente de Puerto Rico, no sin antes dejar a cargo de algunos de sus asuntos legales a un abogado que trabaja en su oficina nombrado J. L. Biamón Sánchez. Cuando el querellado regresó al país, en agosto de 1969, encontró que ya el Lic. Biamón había radicado el 20 de junio de 1969 a nombre del Ingeniero Silva y asociados una moción titulada Suspensión de Subasta. La moción tenía el propósito de evitar que se ejecutara por vía de subasta pública la sentencia original que el Tribunal había dictado en el caso CS-67-2923, a virtud del cual se declaraba vencida la hipo-teca que gravaba los inmuebles de Silva. La moción especificaba que el Lic. Biamón comparecía en representación del. Lic. Mar-tínez Rivera. La subasta, de todos modos se celebró en el mes de agosto de 1969 y el Banco adquirió en esta forma las propie-dades de Silva.

27. Luego de celebrada la subasta el querellado, imbuido totalmente en la litigación, tanto por razón de su condición de persona afectada por la Resolución del Tribunal de Ponce como por su condición de abogado de Silva y al propio tiempo, por su interés económico en la Compañía de Fianzas de Puerto Rico, decidió incrementar su intervención en el asunto. Se trasladó a la Secretaría del Tribunal Superior de Ponce y se dedicó a estu-diar personalmente todo el expediente del caso de ejecución de hipoteca. Llegó a la conclusión legal de que procedía iniciar una acción independiente para anular todos los procedimientos y dejar sin efecto la subasta celebrada.

28. Desde este momento en adelante el querellado asume la iniciativa en toda la estrategia de litigación subsiguiente. Noti-ficó al Ingeniero Silva de sus planes para litigar y éste—que nada tenía que perder—estuvo de acuerdo.

La iniciativa en la estrategia legal del querellado asumía diversas formas. En primer lugar, el querellado radicó, a nom-bre del Ingeniero Silva y sus asociados, una demanda ante el Tribunal Superior, trasladada a Guayama, bajo el número 69-1313, contra el funcionario del Banco Crédito Luis M. Iri-zarry, el Banco y el Alguacil solicitando Daños y Perjuicios por Nulidad de Actuaciones. Por otro lado, el 17 de diciembre de 1969, el querellado asumió el control de una demanda que el Lic. Biamón había radicado el 5 de agosto de 1969, bajo el número 69-2995 ante el Tribunal Superior de Ponce, a nombre del In-geniero Silva y sus asociados contra el Banco Crédito sobre

nulidad de actuaciones. En esta última fecha el querellado enmendó la demanda original del Lic. Biamón para hacer más específica las alegaciones de nulidad.

29. Por otra parte la Compañía de Fianzas de Puerto Rico, y como parte de la estrategia global que, como abogado, había ideado el querellado, radicó una demanda de nulidad de actuaciones contra el Banco Crédito y Ahorro alegando que éste no tenía derecho a ejecutar la sentencia y adquirir los inmuebles del Ingeniero Silva sin notificar adecuadamente de la demanda a la Compañía. Esa demanda fue radicada en el Tribunal Superior de San Juan el 5 de agosto de 1970 y trasladada a Guayama bajo el Núm. 70-1575. Como corolario de este litigio la Compañía de Fianzas logró que se hiciera en el Registro una anotación de 'lis pendens' en relación con los inmuebles a los cuales el pleito se refería. Esta demanda no estaba suscrita por el querellado sino por su empleado, el Lic. J. L. Biamón.

30. El Ingeniero Silva, por su parte y, a solicitud del querellado, suscribió documento 'irrevocable' el 26 de mayo de 1971, autorizando al querellado a que iniciara las negociaciones que fuese menester y llegara a cuantos acuerdos creyera convenientes con los abogados del Banco Crédito en relación con los litigios que hemos descrito.

31. Mientras tanto, la Compañía de Fianzas de Puerto Rico y el Ingeniero Silva continuaban sus negocios de construcción de obras y prestación de fianzas. La crisis, sin embargo, no se hizo esperar. Surgió con motivo de la inveterada costumbre de Silva de prometer más de lo que podía cumplir. En esta ocasión obtuvo de la Compañía una fianza de cumplimiento y pago para la construcción de una escuela en el Barrio Barrancas de Guayama. La Compañía prestó la fianza por $160,000 y exigió, como garantía colateral, el derecho a recibir el 10% que el gobierno retendría para las contingencias de ley. Silva lo cedió a la Compañía, pero luego de iniciada la obra, cedió la totalidad de sus derechos en el contrato a un financiero de Salinas. La Compañía ripostó pidiéndole al Gobierno que le relevara de la fianza prestada. Las autoridades notificaron a Silva que no podría continuar la obra sin fianza que le respaldara. El proyecto quedó abandonado.

32. Por otro lado, la señora madre de Silva, a quien éste hacía figurar como dueña de inmuebles, había otorgado un pa-

garé al portador el 5 de agosto de 1970, garantizando su pago con una hipoteca sobre inmueble inscrito a su nombre. Tanto el pagaré como la hipoteca fueron suscritas ante el querellado, actuando como Notario. Fueron luego entregadas a la Compañía de Fianzas, a través del querellado, como Presidente de ésta para que el pagaré sirviera como colateral a fianzas que la Compañía expedía a favor de Silva.

El 6 de julio de 1971 el querellado como Presidente de la Compañía de Fianzas autorizó a los abogados de ésta a que radicaran demanda contra la señora madre del Ingeniero Silva en cobro del indicado pagaré. El caso se radicó bajo el número 71-3757 del Tribunal Superior de San Juan y originalmente incluía como demandados no solo a la señora madre sino al propio Ingeniero Silva y a la esposa de éste. Posteriormente la Compañía desistió del pleito en cuanto a todos, excepto la madre del Ingeniero Silva, contra quien eventualmente obtuvo sentencia.

33. Mientras esto ocurría, el querellado, como abogado de Silva, había estado en conversaciones con los abogados del Banco con miras a transigir los diversos litigios. Desde luego, durante todo este período el querellado también era el Presidente y prácticamente el dueño de la Compañía de Fianzas de Puerto Rico, entidad que, como sabemos, tenía un gran interés económico en los litigios. Este interés surgía, no sólo del gravamen hipotecario que sobre propiedades de Silva había inscrito en el Registro, sino del hecho de que la Compañía había tenido que desembolsar en exceso de $155,000, con cargo a fianzas del Ingeniero Silva, por concepto de reclamaciones y adelantos a suplidores y acreedores de éste.

34. Finalmente, los abogados del Banco y el querellado llegaron a una transacción. La misma consistiría en que la Compañía de Fianzas adquiriría por compra del Banco los dos inmuebles que habían sido propiedad de Silva. El precio a pagar sería el de $70,000. De esta forma la compañía podía proteger la inversión que ya había hecho y reducir las pérdidas que le estaban ocasionando los negocios con Silva. El Banco, sin embargo, exigió que se le liberara de toda reclamación que Silva pudiera tener contra la entidad bancaria en los litigios pendientes. Actuando como abogado de Silva y sus asociados, pero a la vez consciente de la irresponsabilidad económica de éste la cual cada vez causaba mayores perjuicios económicos a la Compañía de Fianzas, el querellado entendió que era una buena transacción.

No hay duda en el ánimo del Comisionado suscribiente de que en este momento en que el querellado representaba legalmente a Silva y sus asociados, los intereses económicos de éstos no coincidían con los de la Compañía de Fianzas de Puerto Rico.

35. Cuando el querellado notificó a Silva de la propuesta transacción le acompañó un documento, titulado 'Moción de Desistimiento' para que el Ingeniero lo suscribiera y de ese modo pusiera fin a sus reclamaciones contra el Banco en los casos *CS-69-1313* ante el Tribunal Superior de Guayama, y 69-2995 de Ponce. Silva recibió esa notificación el 14 de junio de 1972. Pero Silva estaba sumamente molesto con el querellado porque la Compañía de éste le había cancelado la fianza relacionada con el proyecto del Barrio Barrancos [*sic*]. Por tanto, Silva aprovechó la ocasión y en 15 de junio de 1972 notificó al querellado que no firmaría el documento y que expresamente lo desautorizaba para que lo continuara representando legalmente.

36. El 19 de junio de 1972 el querellado notificó formalmente a los Tribunales de Ponce y de Guayama que ha renunciado la representación legal del Ingeniero Silva y sus asociados.

37. El colapso de los negocios de Silva no se hizo esperar. La prueba ofrecida durante la audiencia demostró que durante los últimos años Silva y su empresa siguieron un patrón general de incumplimiento en todos los proyectos que iniciaban. La Compañía de Fianzas de Puerto Rico sufrió el peso de la carga económica de tal incumplimiento a tal grado que ha desembolsado ya y tiene reclamaciones pendientes de adjudicar por más de $280,000, con cargo a los proyectos de Silva. Al revisar sus libros la Compañía encontró, además, fianzas alteradas y utilizadas en proyectos para los cuales no fueron originalmente expedidas. Eventualmente Silva dejó de pagar a sus acreedores, inactivó la Corporación que había creado y se dedicó a otros menesteres.

38. Luego que el querellado renunció la representación legal de Silva y como la Compañía de Fianzas había sido demandada conjuntamente con éste en varios litigios y Silva no pagó las sumas ordenadas por sentencia, la Compañía tuvo que pagar por él. Como resultado, la Compañía inició litigio contra Silva en reclamación del dinero que había pagado por él. Obtuvo sentencia en contra de Silva. Como éste no tenía bienes sobre los cuales ejecutar la sentencia, la Compañía optó por embargar y eventualmente ejecutar 'cualquier derecho o interés que Silva

pudiera tener en sus reclamaciones contra el Banco Crédito.' En ejecución de sentencia ese 'derecho' embargado fue adquirido por la Compañía de Fianzas en pública subasta.

La Compañía de Fianzas compareció al Tribunal Superior de Guayama y pidió que en el caso del Ingeniero Silva y otros contra el Banco Crédito, bajo el número 69-1313, se sustituyera a la Compañía por los demandantes originales ya que la citada corporación había adquirido, por subrogación, los derechos de aquellos. El Tribunal accedió a que se acumularan a la Compañía de Fianzas como demandante adicional. La solicitud original no fue suscrita por el querellado sino por los Licenciados Edelmiro Martínez, Jr. y J. L. Biamón, como abogados de la Compañía. Sin embargo, el 6 de noviembre de 1972 el querellado compareció en este caso, como abogado de la Compañía de Fianzas, interesando que el Tribunal reconsiderara aquella parte de la resolución que autorizaba la acumulación y no la sustitución de la Compañía en los derechos del Ingeniero Silva. Ante la insistencia del Tribunal de Guayama en su interpretación, el querellado, a nombre de la Compañía de Fianzas, compareció al Tribunal Supremo en solicitud de revisión de ese dictamen.

Así mismo en 11 de agosto de 1972 la Compañía de Fianzas radicó, en el pleito 69-2995, del Tribunal Superior de Ponce otra moción de Sustitución de Parte interesando que se sustituyera a dicha empresa por el Ingeniero Silva y otros como demandante. Es de notar que en todos estos litigios no sólo había comparecido el Ingeniero Silva sino también la esposa de éste y la Howard Construction Corp. como parte. Esta solicitud aparece suscrita por el Lic. Martínez, Jr. y el Lic. Biamón.

Eventualmente el querellado continuó las negociaciones con los abogados del Banco Crédito en relación con las propiedades en disputa. Desde luego, a partir del 15 de junio de 1972, ya el querellado no ostentaba la representación del Ingeniero Silva y sus asociados. Sólo defendía en ese entonces los intereses de la Compañía de Fianzas de Puerto Rico. El acuerdo final con el Banco lo logró el querellado el 7 de diciembre de 1972 en que se otorgó la Escritura Núm. 28 ante el Notario Juan R. Zalduondo.

En síntesis, dicho acuerdo consistió en que la Compañía de Fianzas de Puerto Rico adquirió por compra los dos inmuebles que el Ingeniero Silva y sus asociados habían poseído en Guayama. A cambio de ello el Banco Crédito recibió de la Compañía la suma de $70,000 en efectivo y la promesa de ésta de renunciar

su derecho a exigir el saneamiento. En adición a ello la Compañía se comprometió a responder por el Banco de cualquier responsabilidad que los tribunales pudieran imponer a éste por motivo de reclamaciones judiciales del Ingeniero Silva y sus asociados. En esa forma, la Compañía de Fianzas de Puerto Rico advino dueña de las dos propiedades en litigio."

■ De las determinaciones que anteceden resulta un conflicto entre los intereses del ingeniero Silva y las conveniencias de la Compañía de Fianzas de Puerto Rico respecto a los bienes objeto del pleito sobre ejecución de hipoteca instado contra Silva por el Banco Crédito y Ahorro Ponceño. El querellado no podía representar con toda lealtad los intereses del señor Silva si con ello se afectaba la conveniencia de la Compañía de Fianzas de Puerto Rico, de que era prácticamente dueño. Su deber ético le impedía representar a Silva. El primer cargo quedó cumplidamente probado.

En cuanto al segundo cargo, consideramos que el lenguaje utilizado por el querellado, si bien obedeció a su reacción ante una injustificada y dura expresión del juez señor Matta, no corresponde a la tónica de respeto y consideración que un tribunal de justicia debe siempre merecer, particularmente a los miembros de la clase togada. No obstante, las circunstancias en que se produjeron las expresiones del querellado, no ameritan en este momento más sanción que la precedente amonestación.

■ La conducta toda del querellado, sin embargo, en relación con su participación como abogado del señor Silva y al mismo tiempo presidente y dueño de la casi totalidad de las acciones de la Compañía de Fianzas, con considerable interés económico en los bienes del señor Silva, amerita una sanción severa. Véase el Canon 21 de Ética Profesional.*

___

(*) El Canon 21 es, con ligeras variaciones de estilo, equivalente al Canon 6 del anterior Código de Ética, que quedó suplantado por el actual, adoptado por el Colegio de Abogados en asamblea celebrada el 5 de septiembre de 1970 y promulgado por resolución de este Tribunal de 24 de diciembre de 1970. Véase el anterior canon en 48 D.P.R. pág. X, y véase 4 L.P.R.A., Ap. IX.

*Se decretará la suspensión del querellado del ejercicio de la abogacía y del notariado por un término de seis meses.*

El Juez Asociado Señor Rigau no intervino.